UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRED DAVIS,

    Plaintiff,

v.                                                                    Case No. 13-14250
                                                                  HON. AVERN COHN

CHRYSLER GROUP, LLC,

    Defendant.
_____/

## MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 31)

### I. INTRODUCTION

This is a breach of contract and race discrimination case. Plaintiff Fred Davis ("Davis") is suing Chrysler Group, LLC ("Chrysler") claiming breach of contract and promissory estoppel. Davis claims that Chrysler breached its promise to provide him the opportunity to become the owner of a Chrysler dealership as part of Chrysler's Market Investment ("M.I.") Program. Davis also claims that Chrysler is estopped to deny that it had an enforceable contract with him. Finally, Davis claims that Chrysler subjected him to racial discrimination in the formation and enforcement of a contract, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Michigan Elliott Larsen Civil Rights Act (ELCRA), M.C.L. 37.2012, *et seq.*, and 42 U.S.C. §1981, *et seq.*

Now before the Court is Chrysler's Motion for Summary Judgment (Doc. 31).  For the reasons that follow, Chrysler's Motion is GRANTED IN PART AND DEFERRED IN PART.

## II. BACKGROUND[1]

### A.

Chrysler's M.I. Program is "designed to provide assistance to individual operators who otherwise qualify but lack sufficient capital to operate a dealership."  (Joint Statement of Facts, Doc. 49 at 3)  The objective of the program includes an assessment of the operator's ability to successfully manage a Chrysler dealership.  Through the program, Chrysler and the operator jointly contribute capital to the dealership and over time the operator purchases Chrysler's stock interest in the dealership, thereby becoming sole owner of the dealership.  The M.I. operator is designated general manager of the dealership, and as such is responsible for day-to-day management and operations.

Chrysler employs a rigorous process to approve individuals for participation in the M.I. Program.  A proposed M.I. dealership agreement must be approved through the Dealer Agreement Portfolio ("DAP") process, and any prospective M.I. operator must complete an application and undergo a background investigation and credit check.  In addition, the DAP process requires the candidate to identify his personal assets and liabilities, as well as the source of unencumbered funds for investment in the dealership.  An application for a new operator for an existing M.I. dealership also requires the

---

[1] The background of the case which follows is taken from Joint Statement of Facts for Defendant's Motion for Summary Judgment (Doc. 49).

completion of several documents relating to operational forecasts, working capital and operating investment agreements, balance sheets, a letter of intent, and other approvals. A comprehensive business plan, including a 12-month forecast and buy-out projection, is also required. Finally, the application form states that "no representation, commitment, promise or statement is binding upon or enforceable against [Chrysler] or [its] affiliates unless made in writing and signed by the President, a Vice President, or the national Dealer Placement Manager. No one other than the President, a Vice President, or the national Dealer Placement Manager has the authority to approve a letter of intent or Dealer Agreement." (Doc. 49 at 4-5) Once approved, the M.I. operator employment agreement provides that the operator's employment as general manager of the M.I. dealership is terminable at will. Until Chrysler's interest in the dealership has been bought out by the operator, Chrysler may terminate the operator's participation in the M.I. Program at any time.

**B.**

**1.**

Davis is an African American male residing in Auburn Hills, Michigan, and a current employee of Chrysler. In 2011, Davis held the position of Market Investment ("M.I.") Manager. As M.I. Manager, Davis was responsible for reviewing the operations of the M.I. Dealerships and working with the general managers to improve operations at those dealerships. From time to time, Davis would travel to unprofitable M.I. dealerships to manage a dealership on behalf of Chrysler, remove the general manager, and/or shut a dealership down.

3

**2.**

In January 2011, Davis was assigned as part of his job responsibilities to act as Interim General Manager of the Stone Mountain Chrysler Jeep Dodge Dealership ("Stone Mountain dealership") in Georgia. The Stone Mountain dealership was then being operated under the M.I. Program. Under its existing general manager, the Stone Mountain dealership struggled financially and failed for an extended period of time to meet its Minimum Sales Responsibility ("MSR"). Chrysler removed the existing general manager and assigned Davis to oversee operations at the Stone Mountain dealership.. Davis moved to Georgia to undertake these responsibilities. During his time in Georgia, Davis continued as a Chrysler employee.

**3.**

In March 2011, Davis began discussions with his supervisors regarding his becoming the M.I. operator of the Stone Mountain dealership. Davis expressed an interest in the opportunity to invest in the dealership through the M.I. Program, conditioned on the facility being renovated or possibly relocated. Davis was aware, however, that before becoming an M.I. operator, several specific agreements would have to be executed, and that he would have to resign from his employment with Chrysler and invest substantial funds in the dealership.

On April 22, 2011, Davis sent his supervisor, Gerard Quinn, Senior Manager of Financial Services, an e-mail asking him to confirm that the Stone Mountain dealership would remain a M.I. dealership and that Davis would be the M.I. operator. Davis wrote:

> My wife is a college professor and she needs to notify her employer that she will not be returning in the fall. In addition, she wants to start applying for employment in the Atlanta area ASAP. Before my wife proceeds with

4

> these actions, I want to confirm that Stone Mountain [dealership] will remain an M.I. Store and I will be the invested operator. Please advise.

(Doc. 44 at 30) On April 25, 2011, Quinn responded, "Yes, that is correct Fred, it's yours if that is still your plan. . . . [T]his week we will discuss your timing and transition . . . to Stone Mountain." (*Id.*)

Shortly thereafter, Davis's wife resigned her position as a professor at Saginaw Valley State University and she and their children followed him to Georgia.

**5.**

During the first five months of 2011, the dealership's weak sales performance and poor financial outlook did not significantly improve. During this period, the dealership sold only 94 new vehicles, constituting less than 30 percent of its MSR, and accumulated losses of more than $845,000. Although some of this poor performance was attributable to Chrysler increasing its MSR requirements and reflected an accurate reporting of the dealership's previously underreported losses, there is no question that during these months the dealership failed to meet its MSR and operated at a significant loss. Between January and June 2011, Chrysler contributed more than $1 million to the dealership to restore operating losses and for facility improvements.

**6.**

In June 2011, Davis met with Peter Grady, Vice President of Network Operations and Fleet. Grady informed Davis that based on the Stone Mountain dealership's sales and financial performance over the last six months, it would not be viable for Davis to remain as Interim General Manager of the dealership, or for the dealership to continue under the M.I. Program. Grady informed Davis that Chrysler would no longer continue

5

to support the dealership's financial losses and that the dealership would be considered for sale to a private-capital buyer. Grady also told Davis that he would be reassigned from the Stone Mountain dealership to a management position in Michigan.

**7.**

In April 2012, Chrysler sold the assets of the Stone Mountain dealership. Shortly thereafter, Davis returned to Chrysler headquarters in Michigan, where he was assigned a position as Service and Warranty Training Manager. This reassignment did not result in a change in pay or benefits for Davis.

### III. STANDARD OF REVIEW

The standard for summary judgment is well known and is not repeated in detail. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

### IV. DAVIS'S STATE LAW CONTRACT CLAIMS

Chrysler argues that it is entitled to summary judgment on Davis's breach of contract claim because no contract was formed establishing Davis as the M.I. operator of the Stone Mountain dealership. Chrysler further says Davis has no viable estoppel claim because it made no promise to Davis stating that he would become M.I. operator of the dealership.

6

## A. Davis's Breach of Contract Claim

### 1.

"The essential elements of a contract are parties competent to contract, a proper subject matter, legal consideration, mutuality of agreement and mutuality of obligation." *Borg-Warner Acceptance Corp. v. Dep't of State*, 169 Mich. App. 587, 590 (1988) *rev'd on other grounds*, 433 Mich. 16 (1989). Under Michigan law, such a "contract to contract" must contain all the essential elements that are to be incorporated into the final contract. *Professional Facilities Corp. v. Marks*, 373 Mich. 673, 678-679 (1964). "If the document or contract that the parties agreed to make is to contain any material term that is not already agreed on, no contract has yet been made; and the so-called 'contract to make a contract' is not a contract at all." *Id.* at 679.

### 2.

Chrysler says that Quinn's statement to Davis that "[the dealership is] yours if that is still your plan" was, at most, an unenforceable expression of intent to reach an agreement later. Davis was familiar with the extensive DAP process for potential M.I. operators, none of which occurred here. Chrysler says that, because the parties never agreed upon the material terms of Davis's purchase of the Stone Mountain dealership as M.I. operator, there was no contract formed. Lastly, Chrysler says that Quinn did not have the authority to approve an agreement to make Davis the M.I. operator.

Davis takes the position that Quinn's statement to him constitutes an enforceable contract. He also says that Chrysler has occasionally granted approval for a new M.I. dealership verbally, before the DAP process was completed.[2]

### 3.

Davis's arguments lack merit. Given the extensive requirements of the DAP process, as well as the large number of material terms that had not been agreed upon, Quinn's email is most appropriately construed as an expression of intent to negotiate these terms in the future. Further, as the M.I. application form states, only the Chrysler President, a Vice President, or the national Dealer Placement Manager can approve an individual's participation in the M.I. Program. Here, there is no dispute that, under the terms of the M.I. Program application, Quinn's position did not grant him the authority to approve Davis's participation in the M.I. Program.

### 4.

Because there is no material question of fact as to whether a binding contract was formed, Chrysler is entitled to summary judgment on Davis's breach of contract claim.

### B. Davis's Promissory Estoppel Claim

### 1.

Under Michigan law, promissory estoppel requires: "(1) a promise (2) that the promisor should reasonably have expected to induce action of a definite and substantial character on the part of the promisee, and (3) that, in fact, produced such reliance or

---

[2]  Davis points to the sale of the North Tampa dealership to Jim Browne, discussed in Part V.B. *infra*.

forbearance (4) in circumstances requiring enforcement of the promise if injustice is to be avoided." *Ford Motor Co. v. Ghreiwati Auto*, 945 F. Supp. 2d 851, 871 (E.D. Mich. 2013). Courts are warned "to exercise caution in evaluating an estoppel claim and [to] apply the doctrine only where the facts are unquestionable and the wrong to be prevented undoubted." *Novak v. Nationwide Mut. Ins. Co.*, 235 Mich. App. 675, 687 (1999).

**2.**

Chrysler says that Davis's promissory estoppel claim must fail because he has not demonstrated a clear and definite promise by Chrysler that Davis would become and continue as the M.I. operator of the Stone Mountain dealership. As described above, Quinn's statement is, at most, an expression of intent to negotiate the terms of a future M.I. operator agreement with Davis. Nor did Quinn have the authority to approve Davis for participation in the M.I. Program.

In addition, Chrysler says that under Michigan law, no action for breach of contract or promissory estoppel lies where a plaintiff resigns and relocates his family based on an offer of a new employment, and the employer repudiates prior to the employee's start date. Indeed, Michigan courts have stated that "resignation from one position to assume another and relocation of family would be customary and necessary incidents of changing jobs rather than consideration to support a promissory estoppel claim." *Marrero v. McDonnell Douglas Capital Corp.*, 200 Mich. App. 438, 443 (1993) (citing *Cunningham v. 4-D Tool Co.*, 182 Mich. App. 99, 105 (1989) ("[T]he employment contract was terminable at will by either party at any time. We cannot distinguish the

instant situation from that where the employee is fired after one day of employment. . . . [H]ad defendant employed him for one day and then fired him, he would have no cause of action."). Therefore, even if a clear and definite promise was made, Davis's relocation would not be sufficient to assert a promissory estoppel claim.

**3.**

Chrysler's position has merit. Because there is no material question of fact as to Davis's promissory estoppel claim, Chrysler is entitled to summary judgment on this issue.

### V. DAVIS'S RACE DISCRIMINATION CLAIMS

Davis says that Chrysler racially discriminated against him in the terms of his employment, in violation of Title VII and the ELCRA, and that Chrysler subjected him to racial discrimination in the making and the enforcement of his contract, in violation of § 1981. Both of these claims, however, arise out of Davis's essential argument that he was denied the opportunity to purchase the Stone Mountain dealership through the M.I. Program because of his race.

**A.**

To analyze a circumstantial evidence claim[3] under Title VII, the ELCRA, and § 1981, the court must employ the burden-shifting analysis announce by the United

---

[3] Davis additionally bases his claim on what he says is direct evidence of discrimination. First, he claims that Grady "demonstrated significant racial animus and hostility toward minorities" by removing the word "minority" from the Minority Retail Dealer Development Department's title, in favor of "diversity. However, even when view in light most favorable to Davis, Grady's decision to change the name of the department cannot be construed as evidence that racial bias motivated the decision to deny Davis the opportunity to purchase the Stone Mountain dealership.

10

States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 793 (1973). First, to establish a prima facie case of race discrimination, Davis must show (1) he was a member of a protected group; (2) he was qualified for his position; (3) he suffered an adverse employment action or adverse action by Chrysler in the context of his alleged contractual relationship; and (4) he was treated differently than similarly-situated employees who were outside the protected group. *McDonnell Douglas Corp.*, 411 U.S. at 802; *Hazle v. Ford Motor Co*, 464 Mich. 456, 463 (2001); *Bell v. Ohio Univ.*, 351 F.3d 240, 253 (6th Cir. 2003). If Davis can establish a prima facie discrimination claim, burden then shifts to Chrysler to articulate a legitimate, non-discriminatory reason for its employment decisions; Davis may then establish pretext by showing that his employer's stated reason is false and that discrimination was the true reason for its actions. *Reeves v. Sanderson Plumbing Products*, 530 U.S. 133, 143 (2000); *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003); *Town v. Michigan Bell Co.*, 455 Mich. 688, 696-97 (1997).

**B.**

Chrysler denies that race was a factor in its refusal to allow Davis the opportunity to purchase the Stone Mountain dealership through the M.I. Program. Rather, Chrysler says that the reason for the denial was Davis's poor performance as Interim General Manager and his inability to turn around the failing Stone Mountain dealership.

---

Davis further says that another manager twice stated—more than two years prior in 2007 and 2009—that the M.I. dealerships were "not a welfare program," and once in 2007 asked Davis and two African American colleagues whether they were having a NAACP meeting. However, there is no evidence that this manager had any input in the decision to deny Davis the opportunity to purchase the Stone Mountain dealership. Davis therefore fails to show sufficient direct evidence of discrimination to withstand summary judgment.

Davis says that Chrysler's asserted reasons for the denial are pretextual. To establish pretext, Davis points to the purchase by Jim Browne of the North Tampa dealership through the M.I. Program. Browne is Caucasian. Davis says that Browne was given preferential treatment in becoming the general manager of the North Tampa dealership through the M.I. Program. He says that the relevant facts relating to Browne's purchase of the North Tampa dealership are comparable to those relating to the potential sale of the Stone Mountain dealership, with the only distinguishing factor being that Browne is Caucasian and Davis is African American.

For Chrysler to prevail on summary judgment, it must establish that the material facts concerning the two dealerships are not comparable, and that the circumstances surrounding the sale of the North Tampa dealership and the refusal to sell the Stone Mountain dealership are distinguishable. Given the number of controverted facts in this respect (See Joint Statement of Facts, Doc. 49 at 54-56), summary judgment is not appropriate at this time. As the record stands, it is not clear that race played no role in Chrysler's decision to deny Davis the opportunity to purchase the Stone Mountain dealership.

**B.**

Chrysler must elaborate the material facts relating to the sale of the North Tampa dealership as compared to the potential sale of the Stone Mountain dealership to Davis under the M.I. Program. Chrysler can best do this in not more than ten (10) paragraphs of not more than ten (10) sentences each, in a side-by-side comparison displaying the dissimilarities. Davis shall respond to the statements of material fact following the

Chrysler format in a manner which, according to him, displays the material facts with which there is a genuine issue.

## VI. CONCLUSION

For the above reasons, Chrysler's motion for summary judgment is GRANTED IN PART AND DEFERRED IN PART. Davis's breach of contract and promissory estoppel claims are DISMISSED. The Court will defer consideration of Davis's race discrimination claim until elaboration of the statement of material facts is complete and Chrysler has had an opportunity to amend its Motion for Summary Judgment.

SO ORDERED.

s/Avern Cohn

UNITED STATES DISTRICT JUDGE

DATED: July 24, 2015

I hereby certify that a copy of the foregoing document was mailed to the attorneys of record on this date, July 24, 2015, by electronic and/or ordinary mail.

s/Marie Verlinde for s/Sakne Chami

Case Manager, (313) 234-5160