UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FRED DAVIS,

      Plaintiff,

v.                                        Case No. 13-14250

FCA US LLC,                       HON. AVERN COHN

      Defendant.

_____/

## SUPPLEMENT TO THE MEMORANDUM AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. 55) AND ORDER DISMISSING THE CASE

### I.  INTRODUCTION

This is a breach of contract and race discrimination case. Plaintiff Fred Davis

(Davis) is suing Defendant FCA US LLC (FCA)[1], claiming breach of contract,

promissory estoppel, and the violation of Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq.*, the Michigan Elliot Larsen Civil Rights Act (ELCRA), M.C.L.

37.2012, *et seq.*, and 42 U.S.C. § 1981, *et seq.*

On July 24, 2015, the Court granted in part and denied in part FCA's motion for

summary judgment (Doc. 55). The Court found that FCA was entitled to summary

judgment on Davis' breach of contract and promissory estoppel claims. The Court

further determined that Davis did not offer sufficient direct evidence of discrimination to

withstand summary judgment. Davis moved for reconsideration on the Court's finding

regarding direct evidence. (Doc. 59). The Court denied the motion. (Doc. 66).

---

[1] Effective December 15, 2014, Chrysler Group LLC is known as FCA US LLC.

Now before the Court is the only issue left in the case: whether the circumstantial evidence relating to the sale of the North Tampa dealership by FCA and the refusal to sell the Stone Mountain dealership to Davis are not distinguishable as tested by the burden shifting standard of McDonnel Douglas Corp. v. Green, 411 U.S. 793 (1973) and hence the Court must go to trial (See Doc. 55 at 12). The Court deferred a final decision in order to review the parties' supplemental statements of fact. (Doc. 55). The matter is ready for decision. For the reasons that follow, the circumstances of the two sales are distinguishable, and, hence, FCA's motion for summary judgment on Davis' race discrimination claim based on circumstantial evidence is GRANTED. This case is DISMISSED.

## II.  BACKGROUND[2]

Because this case is familiar both to the parties and the Court, the facts are briefly summarized below.

In 2011, Davis held the position of Market Investment (M.I.) Manager. FCA's M.I. Program oversees a small portfolio of FCA owned dealerships.[3] In January 2011, Davis was assigned to act as Interim General Manager at the Stone Mountain Chrysler Jeep Dodge Dealership in Stone Mountain, Georgia (Stone Mountain CJD). Stone Mountain CJD was struggling financially; it was not meeting its Minimum Sales Responsibility

---

[2] The background which follows is taken from the Joint Statement of Facts for Defendant's Motion for Summary Judgment (Doc. 49) and Memorandum and Order Granting in Part and Denying in Part Defendant's Motion for Summary Judgment (Doc. 55).

[3] FCA's M.I. Program is "designed to provide assistance to individual operators who otherwise qualify but lack sufficient capital to operate a dealership." (Joint Statement of Facts, Doc. 49 at 3) Through the program, FCA and the Invested Operator jointly contribute capital to the dealership and over time the Invested Operator purchases FCA's stock interest in the dealership, thereby becoming sole owner of the dealership. The M.I. Invested Operator is designated general manager of the dealership, and as such is responsible for day-to-day management and operations.

(MSR) goals. While acting as Interim General Manager of the Stone Mountain CJD, Davis continued as an employee of FCA.

While in Georgia, Davis expressed interest in investing in the Stone Mountain CJD through FCA's M.I. Program. Based on his experience working for FCA, Davis was aware that FCA employs a rigorous process to approve individuals for participation in the M.I. Program. A proposed M.I. dealership agreement must be approved through the Dealer Agreement Portfolio (DAP) process. Any prospective M.I. Invested Operator must complete an application and receive signed approval by the FCA President, a Vice President, or the National Dealer Placement Manager. (Doc. 49 at 4-5). No other individual within FCA has the required approval authority. Id.

During the first five months of 2011, Stone Mountain CJD's weak sales performance and poor financial outlook did not significantly improve. There is no question that during these months the dealership failed to meet its MSR and operated at a significant loss.[4] Between January and June 2011, FCA contributed more than $1 million to the dealership to restore operating losses and for facility improvements.

In June 2011, Davis met with Peter Grady, Vice President of Network Operations and Fleet. Grady informed Davis that based on Stone Mountain CJD's sales and financial performance over the last six months, it was not viable for Davis to continue as

---

[4] FCA included a declaration of Bruce Fergusson (Fergusson), Manager-Dealer Network Analytics for FCA, as Exhibit 1 to its Reply in Support of its Motion for Summary Judgment. (Doc. 63). Davis filed a motion to strike the declaration, because Fergusson was an undisclosed witness. (Doc. 65). FCA responded. (Doc. 67). The Court DENIES the motion to strike. Fergusson's testimony did not prejudice Davis and was not presented in bad faith. Furthermore, based on the fact that the Court is granting FCA's motion for summary judgment and the case is dismissed, the undisclosed witness on MSR analysis is unnecessary.

Interim General Manager of the dealership or for the dealership to continue under the M.I. Program.

In April 2012, FCA sold the assets of the Stone Mountain dealership. Shortly thereafter, Davis returned to FCA headquarters in Michigan where he was assigned a position as Service and Warranty Training Manager. This reassignment did not result in a change in pay or benefits for Davis.

### III. LEGAL STANDARD

The standard for summary judgment is well known and is not repeated in detail. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Ultimately a district court must determine whether the record as a whole presents a genuine issue of material fact drawing "all justifiable inferences in the light most favorable to the non-moving party." *Hager v. Pike Cnty. Bd. of Ed.*, 286 F.3d 366, 370 (6th Cir. 2002).

### IV.    DISCUSSION

Proving a case of discrimination under circumstantial evidence is tested by the burden shifting standard of McDonnell Douglas, *supra*.

### A.

According to McDonnell Douglas, the following four elements are required to establish discrimination: (1) Plaintiff belongs to a racial minority, (2) he was qualified for his position, (3) he suffered an adverse employment action by FCA, and (4) he was treated differently than similarly situated employees who were outside the protected group. McDonald Douglas Corp., 411 U.S. at 802; Hazle v. Ford Motor Co., 464 Mich.

456, 463 (2001); <u>Bell v. Ohio Univ.</u>, 351 F.3d 240, 253 (6th Cir. 2003). All four elements must be satisfied.

If Davis can establish the four elements, the burden shifts to FCA to provide a legitimate, non-discriminatory reason for its employment decisions. The burden is one of "production, not persuasion; it can involve no creditability assessment." <u>Reeves v. Sanderson Plumbing Products</u>, 530 U.S. 133, 142 (2000) (internal citation omitted). The ultimate burden of persuasion always remains on the plaintiff. <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 507 (1993). Once FCA proffers its non-discriminatory reasoning for its decision, Davis' claim fails unless he can establish pretext by showing that his employer's stated reason is false and that discrimination was the true reason for its actions. <u>Reeves</u>, 530 U.S. at 143.

## B.

The Court will address each of the <u>McDonnell</u> elements in turn.

### 1.

There is no dispute that Davis satisfies the first required element as he is African American.

### 2.

Regarding the second element, prior to his appointment at Stone Mountain CJD, FCA appointed Davis as Interim General Manager at El Monte Chrysler Jeep Dodge in El Monte, California and Lone Star Chrysler Jeep Dodge in Dallas, Texas (Def. Ex. 2, Davis at 61-65). Both dealerships were struggling financially and FCA sent Davis to remove the current operator so that FCA could either sell or close the dealerships. (Def. Ex. 2, Davis at 62-63). Davis did not financially revive either dealership.

Also, in the five months during which Davis acted as Interim General Manager of Stone Mountain CJD, the dealership failed to meet its MSR targets or demonstrate a consistent upward trend toward profitability. (Mitchell Dec. at ¶ 5). Additionally, Davis failed to identify a source of unencumbered funds for his personal capital investment as required under the DAP application process. (Def. Ex. 2, Davis at 69-72).

In light of these facts, giving Davis the benefit of the doubt, there is a genuine issue of material fact whether Davis was qualified for the M.I. Invested Operator position at Stone Mountain CJD.

**3.**

In order to establish a materially adverse employment action for the third element, Davis has the burden to prove he received "significantly diminished material responsibilities." Kocsis v. Multi-Care Mgmt., 97 F.3d 876, 885-887 (6th Cir. 1996). The Court considers only material adverse action as it is "important to separate significant from trivial harms." Burlington Northern & Santa Fe Railway v. White, 548 U.S. 53, 68 (2006). To be considered "material," the change must be "a significant change in employment status…or a decision causing a significant change in benefits." Burlington Indus. v. Ellerth, 524 U.S. 742, 761 (1998). Neither a bruised ego is sufficient to satisfy this element, nor is a demotion without change in pay, benefits, duties, or prestige. Id.

Here, Davis established a genuine issue of material fact as to whether he suffered an adverse employment action. On the one hand, Davis admitted that his reassignment from M.I. Manager to Service and Warranty Training Manager upon his return to FCA headquarters from Stone Mountain CJD was a lateral move and did not affect his pay or title. (Def. Ex. 2, Davis at 60-61). Additionally, Davis remained at the

6

same pay grade and band level. (Def. Ex. 6, Quinn at 289). The change in position was not a demotion. Id.  However, Davis argued that the Service and Warranty Training Manager position entails significantly diminished material responsibilities and prestige. (Def. Ex. 2, Davis at 60-61). For example, while acting as Interim General Manager of Stone Mountain CJD, Davis was responsible for 40 employees, a multi-million dollar budget, strategic negotiations, marketing, etc. By contrast, in his current role as Service and Warranty Training Manager, Davis is excluded from strategic planning meetings and only indirectly supervises employees.

As such, Davis established a genuine issue as to whether his change in position constituted an adverse employment action.

**4.**

The parties' supplemental statements of fact focused on the fourth McDonnell elements. Assuming, arguendo, that Davis was qualified for the M.I. Invested Operator position and that he suffered an adverse employment action, the Court finds, as detailed below, that Davis failed to establish a genuine issue of material fact as to whether Jim Browne (Browne), a Caucasian M.I. Invested Operator at the North Tampa Florida Chrysler Jeep Dodge Dealership (North Tampa CJD), was a similarly situated person and treated differently.

In order to be considered a similarly situated comparable for the McDonnell analysis, the two individuals must be "similarly situated in all respects." Comiskey v. Automotive Indus. Action Group, 40 F. Supp. 2d 877, 894 (E.D. Mich 1999). Accordingly, they "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or

7

mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." Id. (Internal citations omitted).

Davis says that Browne serves as a similarly situated, non-minority employee who was treated more favorably than Davis.  However, a review of the record shows that Browne is not similarly situated to Davis in "all respects." FCA highlighted sufficient differences in its Supplemental Statement of Material Facts (Doc. 58-1) between Davis and Browne to establish that they are in fact not similarly situated.

For example, Davis is, and was at all times relevant to the potential sale of Stone Mountain CJD, a FCA employee. (Def. Ex. 2, Davis at 57-60). Davis initially worked in marketing investment, and when he was assigned to Stone Mountain CJD in January 2011, he served as Interim General Manager while continuing to receive his FCA salary. (Def. Ex. 2, Davis at 61). At the point that Davis made his interest in becoming a M.I. Invested Operator of the Stone Mountain CJD known, he was still a FCA employee.

On the other hand, Browne, was not a FCA employee when he was approved as the M.I. Invested Operator of the North Tampa CJD. (Def. Ex. 2, Davis at 27). While Browne had been a FCA employee at one point, he had resigned before becoming the Invested Operator of the North Tampa CJD. Davis did not proffer actual evidence, aside from bold statements, that he planned to resign or was in the process of resigning from FCA in anticipation of becoming an M.I. Invested Operator.

Furthermore, Davis and Browne's dealerships were not in the same market – Davis' was located in Stone Mountain, Georgia and Browne's was located in North Tampa, Florida. FCA's decisions of whether to support the two dealerships under the M.I. Program were considered independently of each other and based on each

dealership's individual circumstances. The Stone Mountain CJD was a struggling dealership which accumulated losses and failed to meet its MSR goals for an extended period of time. (Def. Ex. 7, Nagel at 100-101). Davis was aware of Stone Mountain CJD's financial difficulties when he took the position of Interim General Manager and he accepted the position with the understanding that the dealership may potentially close due to its poor financial performance.  (Def. Ex. 2, Davis at 133-135).

By contrast, Browne's North Tampa CJD was a new M.I. dealership with no financial track record. FCA had no presence in North Tampa due to the bankruptcy of a private dealer and needed to quickly establish a presence before franchise laws required providing a protest opportunity to other dealers in the area. (Def. Ex. 5, Grady, at 49-51; Def. Ex. 7, Nagel at 183-184; Def. Ex. 57, Nagel Dec. at ¶3).

Moreover, Davis and Browne differ in that Browne was approved through the DAP process and Davis was not. Davis contends that his repeatedly communicated interest in becoming an M.I. Invested Operator combined with his informal emails with Grady were sufficient to establish a contract for the M.I. Invested Operator position and that approval from a President, Vice President or National Dealer Placement Manager through the  DAP process was not necessary. (Doc. 62-1, ¶ 5 Response). However, in reality, no official DAP agreements were signed, no capital investment was provided by Davis as required, and no approval was given by any President, Vice President, or National Dealer Placement Manager. Id.

Conversely, Browne completed the required DAP application, received the approval from the National Dealer Placement Manager and an agreement was signed

9

between himself and FCA establishing Browne as M.I. Invested Operator of the North Tampa CJD.  (Def. Ex. 57, Nagel Dec. at ¶ 5; Def. Ex. 56, Tangeman Dec. II at ¶ 4-7).

Finally, Davis and Browne differ based on the market conditions at the time of either their approval as an M.I. dealership (Browne) or sale to a private investor (Davis). Decision making for the North Tampa CJD took place in early 2010, less than a year after FCA emerged from bankruptcy and in the early stages of the auto industry recovering from the economic downturn. FCA did not have private investors willing to purchase the North Tampa CJD. (Def. Ex. 5, Grady at 50-51).

By contrast, Stone Mountain CJD was sold in 2012, two years after the North Tampa CJD was sold. At that point in time, the market was on the rise and investors were interested in purchasing dealerships. (Def. Ex. 5, Grady at 163). As such, Davis and Browne were not similarly situated as to timing and market conditions.

## C.

FCA has articulated legitimate, non-discriminatory reasons for its decision to sell Stone Mountain CJD to a buyer with private capital instead of allowing Davis the opportunity to invest in the dealership through the M.I. Program. Grady made his decision based on Davis' inability to substantially improve Stone Mountain CJD's financial and sales performance during the first five months of his employment as Interim General Manager of Stone Mountain CJD. Grady "lost confidence" in Davis' ability to operate Stone Mountain CJD due to the dealership's continuous capital losses and Davis' unimpressive business plan. (Def. Ex. 5, Grady at 163, 168-169). Grady determined that "with capital being precious, [FCA] should be applying it where [it would get a return], which is not in a dealership that's consistently losing money." (Def. Ex. 5,

10

Grady at 170). FCA based its performance standards for Stone Mountain CJD on sound business practices and Davis failed to proffer evidence to establish that FCA's stated reasons for its decisions are false and a pretext for race discrimination.

## V.   CONCLUSION

### A.

Upon review of the record and both parties' supplemental statements of material fact, Browne is not similarly situated to Davis and there are sufficient differences between the two individuals and their surrounding circumstances to establish that one was not treated more favorably than the other. As such, Davis failed to satisfy the fourth element of the McDonnell test, and his race discrimination claim based on circumstantial evidence fails.

### B.

For the above referenced reasons, FCA's motion for summary judgment is GRANTED. This case is DISMISSED.

SO ORDERED.


Dated:  September 11, 2015              s/Avern Cohn_____
                                       United States District Court Judge



I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on September 11, 2015, by electronic and/or ordinary mail.

                                       s/Julie Owens_____
                                       Case Manager


11